AO 106 (Rev. 04/10)  Application for a Search Warrant  (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  2:18-MJ-1691 |
| 420 West Queen Street, Apartment 7, Inglewood, California, as further described in Attachment A-1 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the ___Central___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 371, 2114, 1951, 641 | See attached Affidavit. |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jordan Lovelace, Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

AUSA: Tom Rybarczyk, x8452

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

    The premises located at 420 West Queen Street Apartment 7, Inglewood, California.  Apartment 7 is an interior apartment in a two story building with a light-tan façade and rock wall, the entrance of which faces Queen Street.  The apartment complex also has a back alley entrance, which appears to be gated.



## ATTACHMENT B

**ITEMS TO BE SEIZED**

1.     The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 2114 (Robbery of Mail, Money or Property of the United States), 1951 (Hobbs Act — Robbery — Interference with Commerce by Threats or Violence), and 641 (Theft of Government Property) (the "Subject Offenses"), namely:

      a.     Records, documents, programs, applications, or materials relating to any bank accounts, credit card accounts, or other financial accounts;

      b.     Any firearms, ammunition, and other dangerous weapons;

      c.     Records, documents, applications, or materials containing indicia of occupancy, residency or ownership of the SUBJECT PREMISES;

      d.     U.S. currency in excess of $500;

      e.     Records, communications, and information regarding the robbery and/or theft of USPS trucks;

      f.     Records, communications, and information regarding any plan to rob and/or steal from the USPS;

      g.     Records, communications, and information regarding any plan or effort to obtain a weapon or weapons;

      h.     Records, communications, and information regarding any proceeds, expensive purchases, and/or cash over $500;

i.   Records, communications, and information regarding USPS policy, procedures, and locations for the USPS;

j.   Records, communication, and information regarding any steps taken in furtherance of the scheme, transfers of cash, and the coordination to obtain vehicles;

k.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

l.   Records, documents, programs, applications, or materials showing use of map applications or online searches of addresses related to locations near the Wagner and Dockweiler Post Offices;

m.   Photographs of rental car agreements and any high-end vehicles;

n.   Records, communications, and information regarding any proceeds, expensive purchases, and/or cash over $500;

o.   Records, documents, programs, applications, or materials relating to rental cars and/or discussions concerning remittances;

p.   Records of off-site storage locations, including safe-deposit box keys, records, receipts, or rental agreements for storage facilities;

q.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages(such as Facebook,

iii

Facebook Messenger, Snapchat, FaceTime, and Skype,, SMS text, email communications or other text or written communications sent to or received from any digital device to facilitate the above-listed violations;

r.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

s.   Any digital device used to facilitate the above-listed violations (and forensic copies thereof);

t.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

2.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

iv

      d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      e.    evidence of the times the device was used;

      f.    passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

      g.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      h.    records of or information about Internet Protocol addresses used by the device;

      i.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

5.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant with respect to any biometric sensor-enabled device that is located at the SUBJECT PREMISES or in the SUBJECT VEHICLE and falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress WILLIAM or MYRON's thumb- and/or fingerprints onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific

finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of WILLIAM or MYRON's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

8.   The special procedures relating to digital devices found in this warrant govern only the search of the digital devices found during the execution of the search warrant at the SUBJECT PREMISES and SUBJECT VEHICLE pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order

x

## AFFIDAVIT

I, Jordan Lovelace, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against WILLIAM CROSBY IV ("WILLIAM") and MYRON CROSBY ("MYRON") for a violation of Title 18, United States Code, Sections 371 (Conspiracy to Commit Robbery of Mail, Money or Property of the United States in violation of 18 U.S.C. § 2114).

2.   This affidavit is also made, in support of an application for warrants to search WILLIAM's home, located at 420 West Queen Street, Apartment 7, Inglewood, California, (the "SUBJECT PREMISES"), as described more fully below and in Attachment A-1, and WILLIAM's 2007 Buick Lucerne ("SUBJECT VEHICLE"), as described more fully below and in Attachment A-2, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 2114 (Robbery of Mail, Money or Property of the United States), 1951 (Hobbs Act – Robbery – Interference with Commerce by Threats or Violence), and 641 (Theft of Government Property), (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based on my personal observations, my training and experience, Penlink captured data, and information obtained from law enforcement

personnel.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested criminal
complaint, arrest warrant, and search warrants, and does not
purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II.   BACKGROUND OF POSTAL INSPECTOR JORDAN LOVELACE

4.    I am a Postal Inspector with the U.S. Postal
Inspection Service ("USPIS"), and have been so employed since
February 2012.  I am assigned to the Identity Theft and Economic
Crimes Task Force ("ITEC") of the Los Angeles Division where I
regularly engage in observations, surveillance, searches,
database research, apprehensions, and preparation of criminal
and administrative cases for prosecution.  I have participated
in mail theft, identity theft, bank fraud, wire fraud, and
robbery investigations, many of which have resulted in federal
or state criminal charges.

5.    I graduated from the USPIS Training Academy in 2012.
The 12-week Academy curriculum covered specialized training in
mail theft, identity theft, and postal-related robberies, as
well as the policies and procedures of the United States Postal
Service ("USPS").  I also received additional in classroom and
on the job training in investigating various violations of
federal law, including mail theft, identity theft, mail fraud,
and robberies.  I have also worked with and learned from other

2

agents and criminal investigators with extensive experience in these investigations.

6.    For the past six years, I have been assigned to the Los Angeles Division's Long Beach Mail Theft and Violent Crimes team and the ITEC task force.  I have been involved in preparing and submitting cases and reports for administrative and criminal proceedings regarding mail theft, wire fraud, bank fraud, and robberies.  I have conducted surveillance on static and mobile targets in plainclothes and while operating unmarked vehicles. I have worked on open investigations, developing target files, writing subpoenas and warrants, and developing leads on suspects.  Additionally, I have gathered and examined cell phone records and other information to review as evidence of criminal activity and to identify criminal associates.

7.    Prior to working with the USPIS, I was employed by the United States Air Force TF 17 as a Polygraph Examiner for 7 years.  There, I conducted national security-related, complex polygraph examinations.

### III. **SUMMARY OF PROBABLE CAUSE**

8.    USPIS and the United States Secret Service ("USSS") are investigating one burglary and three robberies of USPS Registered mail remittance bags from USPS trucks, containing more than $260,000 in cash.

9.    As described in greater detail below, evidence gathered in this investigation shows that WILLIAM facilitated and/or participated in the burglary and three robberies and that MYRON facilitated and participated in two of the three

3

robberies.  Among other things, the evidence shows: (1) WILLIAM
is the only USPS employee to have worked both at the post office
where a truck was burglarized on August 1, 2017, and a truck was
robbed on February 1, 2018; (2) WILLIAM was at the time of the
burglary, an acting supervisor with the USPS and thus knew about
the remittance system; (3) a tip from WILLIAM and MYRON's cousin
implicating WILLIAM and MYRON in the second robbery; (4) cell-
site data establishes that WILLIAM and MYRON were at locations
critical to the first and second robberies; (5) pings from
WILLIAM's telephone establish that he was at or near the site of
the fourth robbery the night before it occurred, even though he
lived and worked several miles away from that location; (6)
surveillance video from the second robbery shows that at least
three vehicles appear to be involved, including a Mercedes Sport
Utility Vehicle resembling the one that MYRON rented on the day
of the second robbery; (7) WILLIAM's bank account records show
deposits and withdrawals of thousands of dollars in cash in the
months following the burglary and robberies; and (8) posts to
WILLIAM and MYRON's Instagram accounts displaying weapons and
large sums of U.S. currency.

    10.  USPS records show that WILLIAM lives at the SUBJECT
PREMISES, and Inspectors have seen WILLIAM exiting the SUBJECT
PREMISES.  WILLIAM has registered the SUBJECT VEHICLE and his
semi-automatic pistol to the SUBJECT PREMISES, and Inspectors
have seen WILLIAM driving the SUBJECT VEHICLE.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11. Based on my investigation, review of investigative reports, and my discussions with other Inspectors and law enforcement agents, I know the following:

### A. Background on the Transportation of USPS Money in USPS Registered Mail Remittance Bags

12. Remittances are the proceeds from post offices brought to a consolidation point at a Product and Distribution Center. The remittances are transported via Highway Contract Route vehicles or Postal two-ton vehicles. Not all HCR vehicles or two-ton Postal vehicles transport remittances. Remittances are particularly high at the beginning of the month due to customers' needs to pay bills such as rent, water, gas etc. Customers will purchase large amount money orders to pay these bills. WILLIAM, having served in a supervisory position as well as a clerk's position for the USPS, would be familiar with the USPS close out and remittance procedures, as well as knowledge of higher remittances at the first of each month. Inspector interviews with USPS employees revealed that this information is not known to all USPS employees.

### B. Dockweiler Truck Theft on August 1, 2017

13. On August 1, 2017, USPIS learned that three USPS Registered mail remittance bags had been stolen from an in-service U.S. Mail truck that was parked at the loading dock of the Dockweiler Post Office, located at 3585 S Vermont Ave., Los Angeles, California (the "Dockweiler Post Office"). The three

USPS Registered mail remittance bags contained a total of approximately $129,905.30 in cash remittances.

14.   After the theft, Inspectors interviewed D.H., the driver of the USPS truck, regarding the theft that occurred on August 1, 2017.  Hernandez-Garcia stated the following:

a.   At approximately 6:35 p.m., on August 1, 2017, D.H. unloaded mail from the truck and then picked up three USPS Registered mail remittance bags in a plastic tub.  D.H. signed for and took possession of the plastic tub with the USPS Registered mail remittance bags, returned to the loading dock, and placed the plastic tub with the USPS Registered mail remittance bags inside the trailer of the truck.

b.   D.H. then went inside to retrieve one of the wire cages containing mail.  As D.H. pushed the wire mail cage towards the trailer, he saw an individual run into the trailer. D.H. described the suspect as a black male, approximately 5'7" tall, 200 pounds, dark-skinned, 45-50 years old, with a beard. D.H. said the suspect wore a USPS polo shirt and a dark-colored baseball cap.

c.   When D.H. saw the suspect, he determined that the suspect was going after the USPS Registered mail remittance bags, which prompted D.H. to run toward the trailer and yell "Hey."  The suspect grabbed the tub with the USPS Registered mail remittance bags and ran out of the trailer towards 36th Street, where a silver-colored four-door sedan was waiting for him.  The suspect climbed inside the silver sedan, which sped away westbound on 36th Street.

15.   Inspectors obtained and reviewed surveillance videos from the Dockweiler Post Office.  Surveillance videos show WILLIAM, who was a supervisor at the post office, walking out onto the loading dock on multiple occasions on August 1, 2017, including just before the USPS Registered mail remittance bags were stolen by the suspect and also immediately thereafter.

16.   WILLIAM currently works for the USPS.  WILLIAM was assigned to the Dockweiler Post Office as an acting supervisor during the August 1, 2017, theft.  Based on my training and experience and conversations with USPS and USPIS employees about USPS procedures, I know that supervisors working at the close of the day would know the proper closeout and remittance procedures.

17.   During the investigation, Inspectors interviewed multiple Dockweiler Post Office employees who said that although WILLIAM was fairly new to that post office, it was abnormal for WILLIAM to be on the loading dock.  Specifically, Manager Carol Capone said WILLIAM usually sat at a computer and did not walk around.  D.H. said that prior to the incident, there had only been a few times that WILLIAM spoke to him on the dock.  WILLIAM worked at Dockweiler for approximately three weeks prior to August 1, 2017.

18.   On August 21, 2017, Inspectors interviewed WILLIAM who had been transferred to the Wagner Post Office located at 2200 West Century Boulevard, Los Angeles, California ("Wagner Post Office").  WILLIAM said that upon hearing D.H. yell "Hey," he ran out to the loading dock where he saw Hernandez-Garcia

7

running.  Prior to Hernandez-Garcia's return, WILLIAM re-entered the Post Office and told supervisors to call the police because he believed the USPS Registered mail remittance bags had been stolen.  WILLIAM also said that while at Dockweiler he would go on the dock from time to time but not often.

19.  WILLIAM said that he had no knowledge of the person(s) who committed the theft of the USPS Registered mail remittance bags.  WILLIAM provided his cellular number as 323-370-9383 ("WILLIAM's Telephone").  Based on T-Mobile records, I know that WILLIAM's Telephone was subscribed to WILLIAM from April 18, 2013 to the date T Mobile provided the information on December 15, 2017.  Based on a search of a law enforcement database on June 27, 2018, WILLIAM's Telephone is still registered to WILLIAM.

20.  Inspectors also obtained surveillance video from a nearby apartment complex at 1150 W. 36th Street, Los Angeles, California.  Approximately five minutes after the U.S. Mail truck parked at the Dockweiler Post Office loading dock, a silver sedan with what appears to be paper plates parked on W. 36th Street, outside the post office.  Surveillance video also shows the suspect getting out of the silver sedan within minutes of the USPS Registered mail remittance bags being placed in the truck.  The suspect entered the driveway of the post office and then a couple of minutes later, ran from the post office parking lot with the plastic tub in hand, and climbed into the front passenger side of the silver sedan, which then traveled westbound on W. 36th Street.

21.   The silver sedan arrived approximately five minutes after the U.S. Mail truck pulled into the loading dock.  The suspect appeared on the loading dock within minutes of the USPS Registered mail remittance bags being placed in the U.S. Mail truck.  The timing of the sedan's arrival suggests that the suspect or suspects had real-time information concerning when the USPS truck containing remittances would be docked at the Dockweiler Post Office, possibly coming from an employee.

22.   On June 12, 2018 USSS SA Alfredo Rossi and I showed D.H. a photographic lineup that included MYRON's license photograph.  On June 20, 2018 USSS SA Alfredo Rossi and I showed D.H. a photographic lineup that included the California DMV photograph of WILLIAM's father, William Crosby, Sr.  D.H. did not identify anyone in either of the lineups as being the individual who participated in the burglary on August 1, 2018.

**C.   Wagner Truck Robbery on February 1, 2018**

23.   On February 1, 2018, the USPIS was contacted regarding the armed robbery of USPS driver D.L.  According to D.L., on February 1, 2018, he departed the Wagner Post Office located at 2200 West Century Boulevard, Los Angeles, California, at approximately 6:35 p.m.  As D.L. left the parking lot and turned on to South 2nd Avenue, a white minivan pulled in front of his USPS truck, preventing him from proceeding.  A male passenger in the minivan exited and approached D.L. on the driver's side of the truck.  The man brandished a firearm and ordered D.L. to exit the truck.  The man then walked D.L. to the rear of the truck and repeatedly ordered D.L. to "Hurry up and get it."

D.L. understood this to be the USPS Registered mail remittance bag.  D.L. entered the rear of the truck and retrieved the USPS Registered mail remittance bag.  The man snatched the bag from D.L., entered the minivan, now waiting at the rear of the truck, and the van fled.  The USPS Registered mail remittance bag contained approximately $39,435.06 in cash remittances.

24.  D.L. described the suspect as a dark-skinned black man, approximately six feet tall, with a thin build.  The suspect was wearing a beige hoodie with the hood up and possibly a beanie underneath.

25.  After the August 1, 2017 Dockweiler Post Office burglary, WILLIAM was relocated to the Wagner Post Office and was stationed at the Wagner Post Office on February 1, 2018, the day of the armed robbery.  On February 1, 2018, USPS employment records obtained by USPS Office of Inspector General ("USPS-OIG") show that WILLIAM worked at the Wagner Post Office but was on annual leave that day.  A comparison of the USPS employee roster from Dockweiler Post Office for August 1, 2017 when the burglary occurred and the USPS employee roster from the Wagner Post Office for February 1, 2018 when the robbery occurred, shows that WILLIAM was the only USPS employee to have worked both at the Dockweiler Post Office and the Wagner Post Office on those dates.

26.  Inspectors obtained video surveillance from a location near the Wagner Post Office for February 1, 2018.  A review of that video showed the suspect vehicle, which appeared to be a white minivan, driving near the Wagner Post Office just after

the incident.  As discussed above, D.L., the driver robbed in
the February 1, 2018, incident, said the suspect vehicle was an
older model white minivan with tinted windows and a CarMax rear
paper plate.

27.  On February 8, 2018, WILLIAM was interviewed by
Inspectors and again denied involvement or knowledge of any
robbery.  WILLIAM said he did not know why they would target
Wagner Post Office.  According to WILLIAM, at about 7:00 p.m. on
February 1, 2018, Letter Carrier Niquisha Dean called and told
him that the truck was robbed.  WILLIAM said an employee from
Wagner called Dean and told her, but he did not know who that
person was.  WILLIAM said he was shocked to hear that someone
would rob a postal truck.  WILLIAM also said he worked on
February 1, 2018, at the Wagner Post Office.  WILLIAM could not
provide any further details.

**D.  Dockweiler Truck Robbery on March 1, 2018**

28.  On March 1, 2018, the USPIS was contacted regarding
the armed robbery of USPS driver X.W. for USPS Registered mail
remittance bags.  The USPS Registered mail remittance bags
stolen contained approximately $75,724.07 in cash remittances.

29.  Inspectors responded to the scene and interviewed
witnesses.  X.W. said he arrived at the Dockweiler Post Office
at approximately 6:55 p.m.  X.W. said he picked up three USPS
Registered mail remittance bags from a Dockweiler Supervisor at
approximately 7:30 p.m. and placed the bags in a tub that he
then placed in the trailer of the truck.  X.W. then locked the
back door and departed the post office.

30.   X.W. said he exited the Dockweiler Post Office parking lot, made a right onto Vermont Avenue and then a left onto Exposition Boulevard before taking the onramp for the 110 Freeway traveling south.  X.W. said he took the Slauson Avenue exit and was stopped at the red light at the bottom of the freeway off ramp when he saw a man approaching in his mirror. X.W. said the man pointed a gun at him and said "you know what I want".  X.W. said he knew what the man wanted because of the February 1, 2018 robbery and the August 1, 2017 burglary of USPS trucks for money.

31.   X.W. described the suspect as a black male, light-skinned, approximately 30-40 years old, wearing a black hoodie and thick brown gloves.  X.W. said the suspect held the gun in his right hand, and said "I don't want to shoot you."  X.W. said he exited the driver's side of the truck, and tried to make a commotion to get the attention of people around.  X.W. said at one point the suspect grabbed X.W.'S shirt with his left hand and pulled him to the lock on the back of the trailer.  X.W. said he kept the keys around his neck on a lanyard.  X.W. said he then opened the rear door and moved away from the truck. X.W. said the suspect reached in the tub and grabbed two of the USPS Registered mail remittance bags, at which point the suspect dropped the gun on the ground.  X.W. said the suspect then picked up the gun and ran.  X.W. said the next thing he saw was what appeared to be a black sedan with a female driver make a U-turn and getting back on the 110 Freeway headed south.

32.   Inspectors obtained video surveillance taken from
multiple cameras from locations along the route driven by X.W.
on March 1, 2018.  A review of that video footage showed that
multiple vehicles appeared to follow X.W.'S USPS truck prior to
it reaching the bottom of the off-ramp where the robbery
occurred.  During that review, Inspectors identified a white
Mercedes Benz G-Class that did not have a spare tire on its back
door, a dark colored car appearing to be a Porsche Panamera, and
an SUV appearing to be a maroon Nissan Murano as suspect
vehicles.  Specifically, with respect to the Mercedes,
surveillance video captured from cameras along the route show
the Mercedes pull in to an Arco Gas Station near the
intersection of Vermont Avenue and Exposition Boulevard, park,
and then wait to pull back out until the USPS truck pulls in the
left-hand turn lane of Vermont Avenue.  At that time, the
Mercedes pulls to the exit of the Arco station and foregoes
opportunities to turn on to Exposition Boulevard until just
before the USPS truck turns on to Exposition Boulevard.  The
Mercedes then turned on Exposition Boulevard and followed the
USPS truck along with Porsche, which had been following the
truck once it left the Dockweiler Post Office.  The USPS truck
then entered the 110 Harbor Freeway followed by the Porsche, an
unrelated vehicle, the Nissan, and the Mercedes.  Surveillance
videos taken from cameras along the route then show the Mercedes
exit first and get to the bottom of the exit ramp.  Behind the
Mercedes is the USPS truck with the Porsche directly behind it
and the Nissan directly behind the Porsche.  The Mercedes sits

13

at the end of the off-ramp with an unobstructed chance to turn off the ramp for approximately 25 seconds.  Of that 25 seconds, the light was green was 15 seconds.  During this 25 seconds, the suspect carrying the weapon exits the Murano and confronts the USPS driver.

**E.   Bicentennial Truck Robbery on June 1, 2018**

33.  On June 1, 2018, the USPIS was contacted regarding the armed robbery of USPS driver L.H. for USPS Registered mail remittance bags containing a total of approximately $16,000.  According to L.H., on June 1, 2018, he arrived at the Bicentennial Post Office, 7610 Beverly Boulevard, Los Angeles, 90048, at approximately 7:30 p.m. PST to pick up the day's registry bags, which contain the day's remittances, that is, their cash proceeds from that post office.  L.H. picked up registry bags at approximately 7:40 p.m., placed them in a tub, and then put the tub in the trailer of his postal truck, which was parked near the rear door of the dock.  L.H. locked the back door of his postal truck and departed the dock of the post office.

34.  When later interviewed, L.H. said he exited the post office through the north driveway of the Post Office property and traveled eastbound on Beverly Boulevard.  L.H. took a southbound turn onto La Brea Boulevard.  L.H. then proceeded onto the Interstate 10 South freeway at the end of the eastbound ramp.  While waiting for the traffic light to turn green, a vehicle approached from the rear, passed him on the passenger side, and then stopped in front of L.H.'s postal truck, blocking

14

the onramp.  One suspect ("Suspect 1") arrived at truck's driver-side door, pointed a gun at L.H., and said "don't move, don't do anything."  L.H. said that the other suspect ("Suspect 2") asked for the keys to the trailer, and L.H. gave him the keys.  Suspect 1 ran to the back of trailer and tried the keys. Suspect 1 returned and demanded that L.H. give him the right keys to open the door of the trailer.  Suspect 1 then punched L.H. in the face, and L.H. gave the correct trailer key. Suspects 1 and 2 used the keys, entered the back of the trailer with the keys, then returned to the driver-side door, and demanded that L.H. give them his phone.  Suspect 1 tossed the phone into the bushes.  L.H. watched the two suspects re-enter their vehicle and drive eastbound on the Interstate 10 freeway. L.H. left the trailer of the truck, searched for his phone, and dialed 911 once he found it.  Subsequently, USPIS inspectors determined that approximately $16,000 had been stolen from the truck.

35.  L.H. described Suspect 1 as a black male approximately 5'7", weighing approximately 140 pounds, about 20 years of age, and wearing a black mask, black shirt, and black pants.  L.H. described Suspect 2 as a black male approximately 5'8", weighing approximately 180 pounds, about 20 years of age, and wearing a black mask, black shirt, and black pants.

**F.   Tip Implicating WILLIAM and MYRON in the March 1, 2018 Robbery**

36.  On March 28, 2018, at approximately 1:45 p.m., the USPIS was contacted by an anonymous male caller who reported he

overheard WILLIAM and MYRON talking at a bar in Whittier about the postal armed robbery that happened at the beginning of the month off of the 110 freeway Slauson exit.  The caller said he knows WILLIAM and MYRON, and referred to WILLIAM and MYRON by their first and last names.  The caller said he overheard WILLIAM and MYRON talking about the robbery before it was reported on the news.  The USPIS employee who took the call noted the caller ID readout screen read "BULLARD Maury – 818-345-5295."  Information obtained from Charter Communications indicates this number is subscribed to a Maury Bullard and connected to an address associated with Bullard.[1]

37.  On April 23, 2018, Inspectors interviewed Bullard. Bullard said that WILLIAM is his cousin and that MYRON and WILLIAM have the same father.  Bullard said he was at a bar in Whittier with WILLIAM and MYRON when WILLIAM brought up the robbery that occurred off of the Slauson exit, which Inspectors believe to be the March 1, 2018, Dockweiler truck robbery. Bullard said this was before he saw it on the news, which Bullard thought was weird.  Bullard said he called because he did not want to be tied to what happened.  Bullard said he was not involved, and as a USPS employee, he did not think it was right.  Bullard said the last time he talked to MYRON was through Instagram.  When asked MYRON's Instagram name, Bullard said "Crosby Exotics."  Bullard said he direct messaged MYRON on Instagram about letting him rent a car from the Crosby Exotics

---

[1] Bullard's father's name is Maury Bullard, Sr., and USPS records indicate that Maury Bullard, Sr., also appears to be associated with this address.

Instagram page.  Bullard said that he noticed recently that MYRON was dressing better, and he noticed a nice chain necklace MYRON wore.[2]

### G.   Cell Tower Data Places MYRON's Telephone Near the Wagner Post Office at the Time of the Robbery

38.   Information obtained from Sprint indicates that the number 301-500-7808 ("MYRON's Telephone") is subscribed to Veronica Steele.  A review of MYRON's Facebook posts shows an entry where he refers to and tags another Facebook user named Liyu Sebhat as his mother.  Liyu Sebhat's full Facebook Account Screen Name is "Liyu Sebhat (Lay Lay Steele)."  The photograph attached to the profile appears to depict the same person as the person depicted in the California Department of Motor Vehicles photograph for Veronica Steele.

39.   On April 11, 2018, Inspectors spoke with Isabel Hernandez, MYRON's former co-worker at Playa Del Oro Apartments, located at 8601 Lincoln Boulevard, Los Angeles, California. Hernandez said MYRON quit working at her place of employment to pursue his own business venture.  Hernandez said MYRON had a car rental business that operated on Instagram and the account could be found by searching "crosbyexotics."  A search of Instagram for "crosbyexotics" revealed the publicly viewable CROSBYEXOTICS account for a business named Crosby Exotic Car Rental with a

---

[2] On April 27, 2018, a federal grand jury charged BULLARD, along with four alleged co-conspirators, with Conspiracy, in violation of 18 U.S.C. § 371, Theft of Government Property, in violation of 18 U.S.C. § 641, and Aggravated Identity Theft, in violation of 18 U.S.C. §1028(a)(1), in case number CR 18-233-DSF.  At this time, I believe that Bullard's federal case is unrelated to the instant investigation.

contact number of MYRON's Telephone, an address of 705 W. 9th Street, Los Angeles, California 90015 (the "9th Street Address") as a location, and a link to the website "www.crosbyexotics.com/." The CROSBYEXOTICS account includes images of high-end cars, many of which appear to be parked in a parking structure associated with the 9th Street Address based on the similar look of the garage, which Inspectors have seen during surveillance.

40.   On February 8, 2018, the Honorable Frederick F. Mumm, U.S. Magistrate Judge, signed an order under 18 U.S.C. § 2703(d) requiring wireless carriers to disclose and provide historical "cell-site" or cell tower information for the towers nearest the Wagner Post Office, in case number 18-MJ-290 (the "Cell-Tower Order"). On June 26, 2018, the Honorable Alka Sagar, U.S. Magistrate Judge, signed a warrant requiring wireless carriers to disclose and provide the cell tower log information related to the burglary and robberies, including the information obtained from the Cell Tower Order, in case number 18-MJ-1662. The information received revealed who was near the Post Office and may have been communicating with other co-conspirators before, during, and after the robbery occurred. After reviewing cell tower data from Sprint, Inspectors learned that MYRON's Telephone was near Wagner Post Office around the time of the robbery. Furthermore, a phone call was made from MYRON's Telephone at approximately 6:32 p.m. to a number with the subscriber not yet identified. The robbery occurred at approximately 6:35 p.m.

**H.   Historical Cell-Site Data and Toll Records for the Wagner Robbery Show the Subject Telephone and MYRON's Telephone at or Near Wagner Post Office at the Time of the Robbery**

41.   On April 13, 2018, the Honorable Steve Kim, U.S. Magistrate Judge, signed a 2703(c) and (d) order requiring WILLIAM and MYRON's Telephone's carriers and another carrier to provide historical cell-site data for these telephones and others, in case number 18-MJ-910 (the "Historical Cell-Site Order").[3]   On June 27, 2018, the Honorable Charles F. Eick, U.S. Magistrate Judge, signed a warrant requiring wireless carriers to disclose cell-site data for WILLIAM and MYRON's Telephones, which included the same information regarding WILLIAM and MYRON's Telephones obtained from the Historical Cell-Site Order, in case number 18-MJ-1676.

42.   Based on a review of the data received in connection with this order and the Cell Tower Order, investigators have learned that at approximately 6:35 p.m. on February 1, 2018, the approximate time of the robbery, WILLIAM's Telephone was at or near the Wagner Post Office.   As discussed above, while WILLIAM worked at the Wagner Post Office at that time, WILLIAM was on annual leave on the day of the robbery, February 1, 2018, according to records obtained from the USPS-OIG.   Data received in connection with the Historical Cell-Site Order and Cell-Tower Order also show that WILLIAM's Telephone moved northeast from WILLIAM's home address, the SUBJECT PREMISES, at approximately 6:12 p.m. toward Wagner Post Office and stopping at or near

---

[3] The clerk's office inadvertently stamped the order 18-CM-634.

Wagner Post Office at approximately 6:26 p.m. where it remained until the robbery.

43.   Similarly, based on a review of the data received in connection with the Historical Cell-Site Order and the Cell Tower Order, MYRON's Telephone was also located at or near the Wagner Post Office at approximately 6:35 p.m., the approximate time of the robbery.   The same records show that MYRON's Telephone moved south from the South Los Angeles area at approximately 6:19 p.m. toward Wagner Post Office and stopping at or near the Wagner Post Office at approximately 6:26 p.m.

44.   Based on a review of the same cell-site information, after the robbery, WILLIAM and MYRON's Telephones dispersed from the location of the robbery with both WILLIAM's Telephone and MYRON's Telephone reconvening at or near 11918 Olive Glen Lane, Los Angeles, California (the "Olive Glen Address") at approximately 6:54 p.m.[4]   At 6:54 p.m., according to toll

---

[4] Investigators believe the Olive Glen Address belongs to Felicia Sessions, one of MYRON's purported girlfriends. According to a review of the publicly-available information on Felicia Sessions's Facebook account, MYRON and Sessions have several Facebook posts showing them together.   Additionally, Miro identified Sessions as MYRON's girlfriend, though she said MYRON had several other girlfriends.   On or about June 11, 2018, on a phone call with Miro, she stated she attempted to call MYRON but could not get him.   Miro then said she called "the girlfriend," who she said was Felicia Sessions.   According to Miro, Sessions said MYRON was out of town.   Based on the call records for MYRON's Telephone, since July 2017 to June 2018, Myron has made approximately 1500 calls to 562-225-6287, Felicia Sessions's suspected telephone.   Based on a search of law enforcement databases, 562-225-6287 belongs to Felicia Sessions. According to California Department of Motor Vehicle Records, Sessions lives at the Olive Glen Address.

records, two phone calls between the WILLIAM and MYRON's Telephones occur.[5]

45.   Based on my training and experience, I know it is common for robbery crews to at first go in different directions after the robbery only to meet up soon thereafter in order to split the stolen money.  For example, WILLIAM and MYRON's Telephones took divergent paths after the robbery only to end up in the same cell-site area twenty minutes after the robbery. Further, the Olive Glen Address is, according to Google Maps, at least six miles away from the SUBJECT PREMISES and in another cell-site sector.

I.   **Historical Cell-Site Data and Toll Records for the Dockweiler Robbery Show WILLIAM's Telephone and MYRON's Telephone at or near Dockweiler Post Office at the Time of the Robbery**

46.   On March 1, 2018, WILLIAM was on sick leave from his job at the Wagner Post Office, according to records obtained from USPS-OIG.  Based on a review of the data received in connection with the Historical Cell-Site order, investigators have learned that WILLIAM's Telephone moved northeast from the area his home, the SUBJECT PREMISES, at approximately 6:10 p.m., arrived at or near 3575 Vermont Avenue, an address near the Dockweiler Post Office, at 6:17 p.m.  Call detail records show that at 6:17 p.m., MYRON's Telephone called WILLIAM's Telephone, and the call lasted for 31 seconds.  WILLIAM's telephone

---

[5] According to law enforcement databases, WILLIAM's father is William Crosby, Sr.  While some of those databases suggest William Crosby, Sr., lives in Oklahoma, California Department of Motor Vehicle records show him living 1736 West 107th, Street, Los Angeles, California, which is 1.5 miles away from Olive Glen Address.

remained there until approximately 7:30 p.m., near the time the
USPS truck left the Dockweiler Post Office.  These same records
show that WILLIAM's Telephone was at or near 5820 S. Figueroa
Street, Los Angeles, California, the site of the robbery, at
approximately 7:52 p.m., the same time the robbery occurred.
Afterward, at approximately 7:56 p.m., cell-site records
indicate WILLIAM's Telephone continued southeast toward the
SUBJECT PREMISES.  At 7:56 p.m., MYRON's Telephone makes a
second-long phone call to WILLIAM's Telephone.

47.   Similarly, data received in connection with the
Historical Cell-Site Order shows that MYRON's Telephone moved
southeast from downtown Los Angeles, at approximately 6:17 p.m.,
toward Dockweiler Post Office and stopped at or near the
Dockweiler Post Office between 7:00 p.m. and 7:30 p.m.  MYRON's
Telephone continued to move after the robbery at 7:52 p.m.
southwest toward the Olive Glen Address.  At 7:56 p.m.,
according to the toll records, MYRON's Telephone made a
telephone call.

48.   Similarly, the same records show MYRON's Telephone
moved southeast from downtown Los Angeles, at approximately 6:17
p.m., toward Dockweiler Post Office and stopped at or near the
Dockweiler Post Office between 7:00 p.m. and 7:30 p.m.  MYRON's
Telephone continued to move after the robbery at 7:52 p.m.
southwest toward the Olive Glen Address.  Between the hours of
8:15 p.m. to 9:00 p.m., MYRON's Telephone and WILLIAM's
Telephone met at or near the SUBJECT PREMISES.

49.   As discussed above, WILLIAM and MYRON's Telephones followed the same pattern in dispersing after the robbery only to meet up shortly after the robbery.

### J.   WILLIAM's Telephone Visited the Site of the June 1, 2018 Robbery the Day before the Incident

50.   On April 24, 2018, the Honorable John E. McDermott, U.S. Magistrate Judge, signed a warrant requiring WILLIAM and MYRON's Telephone carriers to provide prospective cell-site and GPS information for their cellphones and one other cellphone, in in case number 18-MJ-987 (the "Ping Warrant").  Based on the review of this information, investigators have learned that on May 31, 2018, WILLIAM's Telephone was at or near the intersection of South La Brea Boulevard and 10 freeway on ramp, the same intersection where the robbery on June 1, 2018 occurred, at approximately 10:50 p.m.  As of June 1, 2018, WILLIAM was still assigned to the Wagner Post Office, according to USPS-OIG records.  As discussed above, WILLIAM lives at the SUBJECT PREMISES, which, according to a Google Maps search, is approximately 6.5 miles away.  WILLIAM's assigned place of work, the Wagner Post Office, was approximately 11.5 miles away. WILLIAM's Telephone returned back to his residence at the Queen Avenue Address at approximately 11:52 p.m.

51.   Based on the Ping Warrant, investigators learned that MYRON's Telephone was at or near the Olive Glen Address at approximately 2:35 p.m. on June 1, 2018 and did not leave that address during the robbery.  Based on my training and experience, I know that individuals involved in criminal

23

activity often fear that authorities are tracking their cellphones, and therefore, when engaging in the criminal activity may leave their primary cellphones behind.

### K.   MYRON's Public CROSBYEXOTICS Instagram Account Depicts an Image of at Least One of the Vehicles Suspected to Be Used in March 1, 2018 Robbery

52.   USPIS Inspector Tristany Wagner reviewed publicly available information from the account of "CROSBYEXOTICS" and found multiple images of a white Mercedes Benz G-Class SUV that is missing the spare tire on its rear door.  Inspector Wagner also found images of a dark colored Porsche that appears to be a Panamera.

53.   Inspector Wagner also reviewed the publicly-available information associated with the CROSBYEXOTICSLIFESTYLE Instagram account and learned that it was associated with MYRON's Telephone and the same address as the CROSBYEXOTICS account, the 9th Street Address.  Inspectors also found an image of a white Mercedes Benz G-Class SUV on the CROSBYEXOTICSLIFESTYLE account.

54.   As discussed above, Inspectors obtained surveillance videos taken from multiple cameras from locations along the route driven by the USPS driver on March 1, 2018.  The Inspectors' review of the footage revealed that at least three vehicles appear to be involved in the robbery of the USPS truck on March 1, 2018.  The vehicles appear to be a dark colored Porsche Panamera, a white Mercedes Benz G-Class SUV that is missing the spare tire from its rear door, and a dark colored Nissan Murano.

55.   On April 13, 2018, Inspector Ramirez conducted a
follow up surveillance at 9th Street Address, which is known as
the Watermarke Tower Apartments, and gained access to the
parking structure and saw a white Mercedes Benz G550, which was
a G-class SUV missing a spare time from its rear door, bearing a
black and white paper plate which read "Mercedes Benz of South
Bay" (the "Mercedes").  A photograph of the VIN
(WDCYC3KF8HX278333) was taken and the registration came back to
Jung Pill and Sae Bom Chang at an address in Santa Monica,
California.  According to the apartment complex's records and
conversations with the apartment complex management, the spot in
which Inspectors saw the Mercedes is associated with unit number
3408, which is leased by a woman named Mary Miro.

56.   On or about April 24, 2018, Inspector Lanzl retrieved
a lease agreement from Key Mercedes in Van Nuys, California
which specified that a 2017 Mercedes G550 4 Door SUV was leased
to Pill Jung and Sae Bom Chang on August 8, 2017.  On June 25,
2018, I spoke with a service technician at Key Mercedes who said
it is not standard for a spare tire to be missing from the 2017
model G550 Mercedes, and in fact, it would be a safety issue.

**L.    Miro Said MYRON Had Possession of the Mercedes on
March 1, 2018, the Same Day as the Dockweiler Robbery**

57.   Call detail records for MYRON's Telephone show that
the user of MYRON's Telephone, believed to be MYRON, was in
frequent contact with 805-607-4842 and 310-925-3065, two

telephone numbers associated with Miro.[6]  Specifically, between July 25, 2017, and April 18, 2018, call records showed the following: (1) 805-607-4842 was in communication with MYRON's Telephone approximately 3,488 times; and (2) and between July 21, 2017, and April 17, 2018, call records show 310-925-3065 was in communication with MYRON's Telephone approximately 1,436 times.

58.  On June 4, 2018, SA Rossi and I interviewed Miro and asked her about calls she made to MYRON on the night of March 1, 2018 robbery.  Miro said she is in constant contact with MYRON because he rents out her vehicles or rooms she has leased for his Airbnb and car rental business.  According to Miro, Sae Chang owned the Mercedes but would allow Miro to rent the vehicle and pay her a percentage of the proceeds.  An open source search into Miro's businesses shows that she owns a home health business called Supreme Home Health Services INC.

59.  Miro confirmed her number was 310-925-3065 and MYRON's was MYRON's Telephone.  When asked how we could determine who had the Mercedes on March 1, 2018, Miro suggested we contact Maurias Baiesc, another man who rents vehicles for from her.  Miro initially declined to provide Baiesc's telephone number to us, but she later called and gave it to me.

---

[6] During the investigation, Inspectors have learned Riverside County Sheriff's Office has an ongoing investigation into vehicle theft that resulted in a search of the 9th Street Address.  Riverside County Sheriff's Deputy Grant Grasso told Inspectors that MIRO gave 310-925-3065 as her phone number and contacted him numerous times from 805-607-4842.

60.  On June 18, 2018, SA Rossi and I interviewed Baiesc
and asked if he rented Miro's Mercedes to anyone on March 1,
2018.  Baiesc said he did not have Miro's Mercedes on March 1,
2018.  According to Baiesc, he last rented Miro's Mercedes in
January and returned it to her the same month.  Baiesc said the
next time he rented out Miro's Mercedes was in May 2018.
According to Baiesc, he noticed that the paper plate that was on
Miro's Mercedes in January had changed from a Keys Van Nuys
Mercedes dealer plate to a South Bay Mercedes dealer plate.  We
showed Baiesc photographs of the white Mercedes Benz G-Glass SUV
taken by surveillance cameras during the March 1, 2018 robbery.
Baiesc said it appeared to be Miro's Mercedes.  According to
Baiesc, Miro's Mercedes was distinct because it was missing the
spare tire on its back.  Baiesc said he removed the spare tire
because the Mercedes had been vandalized and the tire cover
stolen.  Baiesc also said that the tire rims on the Mercedes in
the surveillance videos appeared to be the same as the rims on
Miro's Mercedes.

61.  On June 19, 2018, SA Rossi and I interviewed Miro
again.  Miro said Baiesc keeps better records than she does and
that she did in fact have the Mercedes on March 1, 2018.  When
we asked Miro to look up texts between her and MYRON to see if
she allowed MYRON to use the Mercedes on March 1, 2018, she did.
Miro then showed us a text message exchange between her and
MYRON's Telephone from March 1, 2018, in which MYRON wrote "I'll
give you 600 this even for g wagon," which Miro interpreted to

mean her Mercedes.  At this point in the interview, Miro told us
she allowed MYRON to have the Mercedes on March 1, 2018.

**M.    WILLIAM Deposited Thousands of Dollars in Cash Shortly
after the August 1 Burglary and February 1 and March 1
Robberies**

62.   USPIS requested that Wells Fargo provide it all
account information associated with WILLIAM using his personal
identifying information, including his Social Security number.
According to Wells Fargo financial statements provided to the
USPIS on or about May 10, 2018 for WILLIAM's checking account
ending in 9540 (the "9540 Account"), I learned the following
transactions—all in cash—occurred on the 9540 Account:

| Date | Type of Transaction | Amount |
|------|--------------------|--------|
| December 20, 2017 | Deposit | $1,000 |
| February 7, 2018 | Deposit | $1,880 |
| March 19, 2018 | Deposit | $1,000 |
| April 6, 2018 | Deposit | $8,000 |
| April 10, 2018 | Deposit | $700 |
| April 10, 2018 | Deposit | $1,500 |
| April 11, 2018 | Deposit | $7,000 |

63.   USPIS requested that Bank of America provide it all
account information associated with WILLIAM using his personal
identifying information, including his Social Security number. [7]
According to the Bank of America statements provided to USPIS on
or about April 14, 2018 for WILLIAM's checking account ending in
8829 and savings account ending in 5094 (the "Bank of America

---

[7] According to Bank of America records, on June 7, 2015,
WILLIAM conducted a cash withdrawal of $11,000.

Accounts"), I learned the following transactions—all in cash—occurred in connection with the Bank of America Accounts:

| Date | Type of Transaction | Amount |
|------|---------------------|--------|
| August 18, 2017 | Deposit | $1,000 |
| September 18, 2017 | Deposit | $1,300 |
| October 11, 2017 | Deposit | $7,000 |
| October 11, 2017 | Withdrawal | $750 |
| October 12, 2017 | Withdrawal | $6,000 |
| October 13, 2017 | Deposit | $6,000 |
| October 16, 2017 | Deposit | $750 |
| October 16, 2017 | Withdrawal | $6,150 |
| October 17, 2017 | Withdrawal | $740 |
| October 17, 2017 | Deposit | $810 |
| November 8, 2017 | Deposit | $7,000 |
| November 9, 2017 | Withdrawal | $5,000 |
| November 17, 2017 | Deposit | $1,500 |
| November 27, 2017 | Withdrawal | $2,000 |
| December 5, 2017 | Deposit | $1,000 |
| December 7, 2017 | Deposit | $1,630 |

64.  According to USPS-OIG records, WILLIAM is a full-time employee currently assigned to Wagner Post Office.  His base salary is $41,874.00.  These deposits and withdrawals are in addition to WILLIAM's salary, which is electronically deposited by the United States Postal Service bi-weekly.  The aforementioned transactions only include cash deposits and withdrawals above $500.

65.  Based on my training and experience, I know individuals engaged in criminal activities will "structure" their transactions so that multiple cash deposits are made each under $10,000, sometimes over the course of several days or at multiple branches of a financial institution, in an effort to

avoid the reporting requirements of the Bank Secrecy Act.  Such activity is known as "structuring" and is illegal.

66.  Similarly, based on my training and experience, sporadic cash deposits and withdrawals outside of an individual's legitimate financial means show an attempt to launder money derived from illegal proceeds.

### N.   WILLIAM and MYRON's Instagram Accounts Have Pictures Displaying Weapons and Large Amounts of Currency

67.  On April 27, 2018, the Honorable John E. McDermott, United States Magistrate Judge, signed a search warrant authorizing the search of MYRON's CROSBYEXOTICS, CROSBYEXOTICSLIFESTYLE, and CROSBYFURNITURE Instagram accounts and WILLIAM's Instagram Account, STR8CUTHROAT.[8]  On May 20, 2018, Instagram provided us the information in response to the warrant.  During SA Rossi and my review of that information, I learned that:

a.   On August 2, 2017, a picture posted on WILLIAM's account shows what appeared to be fully automatic rifles and pistols with the caption "Tool Box."  This picture was sent from

---

[8] In reviewing Instagram for additional accounts which may be associated to MYRON, Inspectors found the STR8CUTHROAT account.  Although the STR8CUTHROAT account is set to private, a profile image is visible, which appears to depict WILLIAM.  This same image can be found on the Facebook account believed to belong to WILLIAM.  Further, in the data provided by Instagram in response to the warrant, Instagram indicated that the account belongs to an individual associated with WILLIAM's telephone and has multiple pictures associated with it depicting WILLIAM.  Instagram records also show that the CROSBYEXOTICS, CROSBYEXOTICSLIFESTYLE, and CROSBYFURNITURE are all associated with MYRON's Telephone.

STR8CUTHROAT to "CROSBYEXOTICS", "Gary_Walker24", "Dfailure622", and "Christopher_roshskive."[9]  Below is a copy of that picture:



    b.  On September 3, 2017, a video posted on the CROSBYEXOTICS account depicts cash in $20 and $100 denominations in a shopping bag.  This video was found in CROSBYEXOTICS's deleted videos.

    c.  Also, on September 3, 2017, a picture sent from the CROSBYEXOTICS account to WILLIAM's account depicting multiple stacks of cash with different denominations laid on a wooden floor.  WILLIAM's Account replied "Ok."  In response, the

---

[9] We have not yet obtained information from Instagram identifying who "Gary_Walker24", "Dfailure622", and "Christopher_roshskive" are.

"CROSBYEXOTICS" account states "Got it."   Below is a copy that picture:



d.   On September 5, 2017, a video posted on the "CROSBYEXOTICS" account depicts a safe full of money in unknown denominations.

e.   On October 11, 2017, a video posted to the "CROSBYEXOTICS" account depicts MYRON pointing a pistol at the camera and dancing to music.  I reviewed the video and determined it to be MYRON because his physical features match the features on MYRON's California driver's license photograph. On the next page is a screenshot taken from that video:



f.    On November 30, 2017, a photograph posted on the CROSBYEXOTICS accounts depicts a handful of cash in different denominations in front of a Chase Bank.[10]

g.    On January 27, 2018, a video posted on the "CROSBYEXOTICS" account shows unknown black male counting cash while driving a Maserati and a caption which says "REST WELL BIG BRO."

h.    On February 3, 2018, a video on the "Crosbyexotics" account shows an unknown black male counting money while sitting in an unknown model Mercedes.  The denominations of the money appear to be $20 bills and $50 bills. The caption posted with the video reads "CROSBY MEAN SOMETHING". This video was uploaded two days after the February 1, 2018 robbery.  On the next page is a screenshot taken from that video:

---

[10] MYRON does not appear to have an active account with Chase.



**O.   WILLIAM Lives at the SUBJECT PREMISES and Drives the
SUBJECT VEHICLE**

68.   On or about June 21, 2018, I reviewed California
Department of Motor Vehicle ("DMV") records for WILLIAM and
learned that his driver's license lists him as living at the
SUBJECT PREMISES.  According to USPS-OIG records, WILLIAM lives
at the SUBJECT PREMISES.

69.   On May 07, 2018, Inspector Croonquist saw WILLIAM exit
the west alley of the SUBJECT PREMISES.  Inspector Croonquist
determined it was WILLIAM by comparing his DMV photograph with
the person they saw exiting the SUBJECT PREMISES.

70.   On June 19, 2018, during surveillance of the SUBJECT
PREMISES, Inspector Robbins spoke with a letter carrier who was
familiar with the SUBJECT PREMISES and its occupants.  When the
carrier was asked who lived specifically at Apartment 7, the

carrier replied, "A man named William lives there.  I believe he is a postal employee."

71.  On April 27, 2018, while on surveillance at the building containing the SUBJECT PREMISES, Inspector Abebe observed the alley behind the SUBJECT PREMISES where he saw a rear parking lot accessible via the alley.  Inside the parking lot was a Buick sedan with California license plate 6ADJ526 (the SUBJECT VEHICLE), which, according to DMV records, was registered to WILLIAM.  Inspector Abebe also saw a blue Harley-type motorcycle exit the back alley.  The bike was operated by a tall heavy-set black male who appeared, to Inspector Abebe, to fit the description of WILLIAM.

72.  On June 22, 2018, SA Rossi and I saw WILLIAM exit the Wagner Post Office where he works, enter the SUBJECT VEHICLE, and drive it to various nearby locations.

73.  On June 28, 2018, I saw the SUBJECT VEHICLE parked near the SUBJECT PREMISES at approximately 8:20 a.m.

## V.   TRAINING EXPERIENCE REGARDING THE SUBJECT OFFENSES

74.  Based on my training and experience, and information I have obtained from other law enforcement officers, I know the following:

a.   Individuals involved in armed robberies and burglaries often maintain books, records, receipts, notes, ledgers, bank records, money orders, maps, and other papers relating to the planning and execution of the offense, as well as firearms and other weapons for use in the offense.  The aforementioned records and weapons are often maintained where

35

the subject involved with the offense has ready access to them, such as the robber's residence, places of business, vehicles, and other locations from which the subject had planned the robbery.  Such records are also often stored on the robber's cellular phones, smart phones, laptop computers, and other digital devices.  These devices are also often found in the subject's house and vehicle.

       b.   Individuals involved in armed robberies often keep their firearms at or near where they live, including inside their vehicles, houses, and storage areas.

       c.   Individuals involved in armed robberies and burglaries often store proceeds from their robberies or burglaries in their homes, residences, and/or vehicles. Additionally, these same individuals will store evidence of these proceeds on their digital devices, including photographs of expensive purchases and pictures of large amounts of currency.  For example, in this case, MYRON posted several pictures of large amounts of currency on his Instagram page.

       d.   Communications between people participating in the robbery take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of routes, targeted vehicles, relevant locations and tools required for the execution of the robbery.  In addition, it is common for people engaged in armed robberies to have photos and videos on their cell phones or computers of illegal proceeds, as they frequently send these

36

photos to each other and others to boast about their illicit
endeavors.  Additionally, individuals engaged in burglaries and
robberies often maintain evidence of purchases made with their
proceeds in their homes, cars, and garages.  Further,
individuals engaged in burglaries and robberies often maintain
cash in safes and other storage areas within their homes,
including their garages and basements and in their vehicles.

> e.  Armed robbers often keep the names, addresses,
and telephone numbers of their coconspirators on their digital
devices and in their homes, residences, and vehicles.

> f.  It is common for armed robbers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between associates and robberies.
These phones range from sophisticated smart phones using digital
communications applications such as Blackberry Messenger,
WhatsApp, and the like, to cheap, simple, and often prepaid flip
phones, known colloquially as "drop phones," for actual voice
communications.

## VI.   TRAINING AND EXPERIENCE ON SUBJECT DEVICES

75. As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the

integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[11] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-

---

[11] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used,

what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

76. As discussed herein, based on my training and experience I believe that digital devices will be found during the search.  Based on information received WILLIAM and MYRON's carriers, I believe both WILLIAM and MYRON possess iPhone model 6 or a later model.

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of

such devices to select which features they would like to utilize.

      b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

      c.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition

feature, a user must hold the device in front of his or her
face.  The device's camera analyzes and records data based on
the user's facial characteristics.  The device is then
automatically unlocked if the camera detects a face with
characteristics that match those of the registered face.  No
physical contact by the user with the digital device is
necessary for the unlock, but eye contact with the camera is
often essential to the proper functioning of these facial-
recognition features; thus, a user must have his or her eyes
open during the biometric scan (unless the user previously
disabled this requirement).  Several companies produce digital
devices equipped with a facial-recognition-unlock feature, and
all work in a similar manner with different degrees of
sophistication, e.g., Samsung's Galaxy S8 (released Spring
2017) and Note8 (released Fall 2017), Apple's iPhone X (released
Fall 2017).  Apple calls its facial-recognition unlock feature
"Face ID."  The scan and unlock process for Face ID is almost
instantaneous, occurring in approximately one second.

          d.    While not as prolific on digital devices as
fingerprint- and facial-recognition features, both iris- and
retina-scanning features exist for securing devices/data.  The
human iris, like a fingerprint, contains complex patterns that
are unique and stable.  Iris-recognition technology uses
mathematical pattern-recognition techniques to map the iris
using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both

eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

77.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

78.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not

been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.   I do not know the passcodes of the devices likely to be found during the search.

79.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

80.  For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to any biometric sensor-enabled device that is

(a) located at the SUBJECT PREMISES or in the SUBJECT VEHICLE
and (b) falls within the scope of the warrant: (1) compel the
use of WILLIAM or MYRON's thumb- and/or fingerprints on the
device(s); and (2) hold the device(s) in front of WILLIAM or
MYRON's face with his eyes open to activate the facial-, iris-,
and/or retina-recognition feature.  With respect to fingerprint
sensor-enabled devices, although I do not know which of the
fingers are authorized to access any given device, I know based
on my training and experience that it is common for people to
use one of their thumbs or index fingers for fingerprint
sensors; and, in any event, all that would result from
successive failed attempts is the requirement to use the
authorized passcode or password.

81.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII.  REQUEST FOR NIGHTTIME SERVICE

82.  I request that the Court authorize investigators to
serve this warrants during the nighttime, as set forth under
Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  Good cause for nighttime
service exists because, as discussed above, WILLIAM and MYRON
participated in facilitating a violent crime, a violent crime
which has recently escalated to a USPS driver being attacked.
Additionally, according to the California Law Enforcement
Telecommunication database, WILLIAM owns a semi-automatic
handgun, which he registered to the SUBJECT PREMISES.  According
to same the database, MYRON also owns two semi-automatic

pistols.   Additionally, as discussed above, one of the Instagram posts associated with WILLIAM's account showed what appeared to be fully automatic rifles and pistols with the caption "Tool Box."

### VIII.       REQUEST FOR NO-KNOCK ENTRY

83.    Based on the evidence described above, I believe that knocking and announcing entry would be dangerous to the law enforcement personnel serving the warrant, given the violent nature of the crime alleged and the fact that WILLIAM owns a firearm that he keeps at the SUBJECT PREMISES.   Knocking and announcing would also allow for the quick destruction of evidence, namely ledgers, money, and firearms.   I also know, based on my training and experience, including my participation in several search warrants, that critical evidence has been destroyed by subjects while knock and announces have been conducted.

### IX.   CONLUSION

84.   For all the reasons described above, there is probable cause to believe that WILLIAM CROSBY and MYRON CROSBY have violated Title 18, United States Code, Sections 371 (Conspiracy to Commit Robbery of Mail, Money or Property of the United States in violation of 18 U.S.C. § 2114).   Based on the foregoing facts, there is also probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses described above, will be found in the SUBJECT PREMISES

48

described in Attachment A-1 and in the SUBJECT VEHICLE as
described in A-2.


_____

JORDAN LOVELACE,
Postal Inspector
United States Postal
Inspection Service

Subscribed to and sworn before me
this _____ day of June, 2018.


_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

49